[No. 56951-7.   En Banc.   March 14, 1991.]

THE STATE OF WASHINGTON, *Respondent*, v. CRAIG
S. LITTLE, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. JASON
RAYMON DAVIS, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. WALTER
GLEN HAYDEN, *Appellant*.

*Julie A. Kesler, Scott G. Busby, Eric Broman,* and *Suzanne Elliott* of *Washington Appellate Defender Association,* for appellants.

*Norm Maleng, Prosecuting Attorney, Greg R. Hubbard, Assistant Chief Deputy,* and *Sabrina K. Housand, Deputy,* for respondent.

*Gregory E. Keller* on behalf of the American Civil Liberties Union; *Neil M. Fox* on behalf of Seattle–King County Public Defender Association, amici curiae for appellants.

DORE, C.J.—In separate incidents arising at Lakeshore Village Apartments, the Seattle police arrested the appellants after detaining them for the purpose of determining whether they were engaged in criminal trespass on the grounds of the complex. Appellants were tried and convicted in juvenile court. Upon consolidation and transfer to this court, each appellant challenged the validity of his initial stop and the police orders to stop.[1] We hold that the

---

[1]We granted appellants' motion to consolidate and transfer their appeals to this court for purposes of argument and decision. The consolidated appeal encompassed three separate incidents which occurred at Lakeshore Village Apartments involving police investigation of appellants for criminal trespass. Due to the facts of the case and the nature of the crime charged, we now separate *State v. Glover* from the other cases and decide that appeal in a separate opinion. *See State v. Glover,* 116 Wn.2d 509, 806 P.2d 760 (1991).

arresting officers in each case possessed the requisite reasonable suspicion to conduct a *Terry* stop for criminal trespass. *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). We affirm Little's convictions for·obstruction of a public servant and criminal trespass, and Davis' and Hayden's convictions for obstruction.

## FACTS

Lakeshore Village Apartments is a multiunit apartment complex occupying roughly one city block with approximately 500 residents. The apartment management, experiencing problems with drug and gang activity, took steps to discourage the gathering of crowds and trespassing on the apartment grounds. To curtail the flow of traffic on the apartment grounds, management encircled the complex with a fence topped with concertina wire and posted signs prohibiting trespassing or loitering in the complex. In addition, an armed security guard attends to the main entrance. The no trespassing signs, some 18 by 24 inches and others 24 by 24 inches, are placed on buildings intermittently throughout the complex, on the buildings facing the entrance and at the entrance itself. The signs say different things such as "No Trespassing or Loitering", "No Loitering. Tenants and Their Guests Only", and "Violators Will Be Prosecuted". Residents and their guests are permitted on the premises to go to residences. Guests not in the company of a resident may not remain on the premises.

In addition, the management has an agreement with the Seattle Police Department to investigate persons who are suspected of being trespassers. If an individual investigated is found to be a nonresident, the police admonish the individual not to return to the property and ask the person to sign a card acknowledging the initial trespass and advising that next time the person will be cited for criminal trespass if the individual returns. The cards are kept on file and the police check the file if they confront a person loitering in the area.

Officer Saucier, who arrested Hayden and Davis, was concerned about his safety and testified

[OFFICER SAUCIER]: Okay. This area, this whole complex, has become a—is—has become, I guess, gathering place for the various gangs in the area, the Crips, Bloods, and the Black Gangster Disciples. We've made numerous arrests of gang members in this area. Several of them found to be armed. Several of them just committed drive–by shootings. We've had numerous drive–by shootings in this complex specifically.

So anytime an officer goes in there, it's either with another officer, or several other officers. Just because of the danger in this area.

At the time that I found myself with these three suspects, from prior experience, looking at their clothing, I recognized them to be wearing the clothing of a specific gang. I knew that there was a high danger to myself. At that time, for my own protection, you know, because he had been going into his pockets, I chose to draw my gun. I ordered the three individuals to the ground. These two were approximately positioned here. And I positioned myself over the other individual so I could maintain, you know, visual contact with all of them. I told them to spread their arms out.

Hayden/Davis Fact–Finding Hearing, at 29–30 (May 8, 1989).

### STANDARD OF APPELLATE REVIEW
### OF CONVICTIONS

■ In *Seattle v. Slack*, 113 Wn.2d 850, 784 P.2d 494 (1989), this court set forth the standard of appellate review of convictions. In *Slack* we stated:

Inquiring into the sufficiency of evidence to support a conviction does not require the reviewing court to determine whether it believes the evidence at trial established guilt beyond a reasonable doubt. *State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Green,* at 221.

113 Wn.2d at 859.

The present case consists of separate incidents. The specific facts of each case follow:

A. *State v. Little.*

On April 21, 1989, Betty Fears, the project manager of the Lakeshore Village Apartments, testified that she received a call from her answering service

> [MRS. FEARS]: . . . that there were [*sic*] a large group of people gathered by one of the buildings, we called the police.

She also related that

> We have a problem at Lakeshore with drugs and gang activity and large groups tend to make us think that something is going on that we need to be—to have some action taken on.

Little Fact–Finding Hearing, at 4–5 (June 16, 1989). She called the police and, at approximately 9:18 p.m., Seattle Police Officer S.M. Colman and his partner were dispatched to the 9000 block of 53rd South to investigate the report. Upon arrival, Colman saw more than 20 juveniles assembled in the intersection between Fisher Place and 9053 53rd South. The juveniles "immediately broke and ran" in several directions. Colman exited his patrol car, yelled "Stop, police," and began pursuing the individuals on foot. Little Fact–Finding Hearing, at 12 (June 16, 1989).

As Colman came around the corner of one of the buildings, he saw six or eight juveniles climbing the chain link fence. At that time he came alongside of Craig Little and another person walking through the complex. As Colman passed, Little's companion ran off to the left and Little then ran to the right. Colman then "peeled off from [his] initial pursuit of the people over the fence" and yelled for Little to stop as he chased Little into a nearby building. Little attempted to shut the door, but Colman stuck his nightstick in the door jamb. Little Fact–Finding Hearing, at 13 (June 16, 1989). Little attempted to shut the door several times, but Colman's nightstick prevented Little from doing so. Colman eventually opened the door, grabbed Little and arrested him for obstructing a police officer.

Little was charged by information with one count of criminal trespass, RCW 9A.52.070, and one count of obstructing a public servant, RCW 9A.76.020(3).

Judge Carmen Otero, finding Little guilty on both counts, analyzed as follows:

THE COURT: The Court makes the following findings on the Obstruction. The Officer was dressed in his uniform. He was dispatched. He was on duty. The Court finds that the Respondent did see the Officer. That he was aware, and made aware, that the Officer told him to stop. That he not only refused to stop, he had already taken off before he was told to stop. That he ran into a building. That he purposely tried to slam the door on the Officer. The Officer had his nightstick in the door and he kept trying to push the door until finally the Officer was able to open the door and arrest the Respondent for Obstructing.

Although I am not a person who goes along with some of the Obstructing charges that officers bring, I believe this certainly does fall within the Statute. The Officer was working. That he was on duty. He was obviously, an officer. The Respondent was aware that he was an officer. And that he did obstruct him in the line of duty.

The Court then moves onto the next charge. And that is the Trespass. The Court can only go on the evidence presented here in court. And the Court finds that any evidence, or any argument about drugs is just not relevant to this case. There was no evidence of drugs. The only issue is whether the Respondent was on the property and whether he had a lawful right to be on the property.

The Court finds that upon seeing the Officer, even before the Officer talked to him, he immediately ran. Not only did he run away from the Officer, he ran into the building, tried to force the door closed, preventing the Officer to come into the building. There were signs, signs that indicated in a clear language that there was to be no loitering. And the Respondent was on the property and loitering.

The Court finds that his actions, plus the signs is sufficient for this Court to find that he was in fact trespassing.

Little Fact-Finding Hearing, at 29, 30, 31.

B. *State v. Hayden* and *State v. Davis.*

On the afternoon of January 23, 1989, Officers Kenneth Saucier and J.T. Rodgers were conducting a criminal trespass check at the Lakeshore Village Apartment complex. When they arrived at the property, the officers saw a group of 10 or more youths standing around a car in the parking lot. Both officers testified that they were generally familiar with the residents of the complex and that they did not recognize any of the youths as being residents. The officers

approached the group to determine whether they lived at the complex or whether they were trespassers. As the officers moved toward the group, the youths started to disperse. Saucier exited the patrol car and told the group to stop and come toward the car. Jason Davis, Walter Hayden and another youth ran. Saucier pursued Davis on foot while Rodgers pursued the other two in the patrol car. After a brief chase, the officers arrested the youths.

Officer J.T. Rodgers testified as to identifying the defendants when he first arrived and subsequent to their arrest by Officer Saucier.

Q. At what point did you see their faces?
A. At the initial contact.
Q. Which was?
A. Just before they started to run from us at the beginning of the whole incident.
Q. At what point did you see their faces again?
A. When my partner had them all on the ground, or I believe they were on the ground. When I had gotten out of my patrol car, just after I had lost sight of the two, walked around the corner—or actually ran looking for my partner. And that's when I saw them again. And they were somewhat "in custody."
Q. Approximately how long—how much time elapsed, would you say, between the time of the initial contact and the point at which they were apprehended?
A. Somewhere between 60 to 90 seconds.
. . . .
Q. About how many second[s] was it between the time that you first saw the group of people around the car and the group started to disperse?
A. It would probably be, I'd say, around 5 seconds.
Q. Now, is it your testimony that in this 5 seconds, you were able to determine that none of the people there belonged there in the sense of being residents there?
A. As they started loosening up to disperse, it wasn't like they were all taking off. We got very close to them before any of them actually ran. So they were still close enough so I could visually scan who was there.

Hayden/Davis Fact–Finding Hearing, at 40, 41, 49 (May 8, 1989).

Davis and Hayden were both charged by information with one count of obstructing a public servant in violation of RCW 9A.76.020(3). After a fact–finding hearing Judge

Norman Quinn found both individuals guilty as charged and sentenced them within the standard range. Davis and Hayden appealed.

In each case, the police detained or sought to detain the appellants to determine whether they were trespassing on the grounds of the apartment complex. Each juvenile appealed his conviction and challenged the propriety of his initial stop or the police order to stop. Appellants argued that the actions of the police exceeded the sanction of *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968) and, therefore, violated their rights under the Fourth Amendment and article 1, section 7 of the state constitution.

### DIMENSIONS OF A PERMISSIBLE INVESTIGATORY STOP

The Fourth Amendment applies to all seizures of persons, including those involving only a brief detention short of traditional arrest. *Davis v. Mississippi,* 394 U.S. 721, 22 L. Ed. 2d 676, 89 S. Ct. 1394 (1969); *State v. Larson,* 93 Wn.2d 638, 641, 611 P.2d 771 (1980). For the purposes of the Fourth Amendment, a person is "seized" whenever a police officer accosts that person and restrains his freedom to walk away. *Terry,* 392 U.S. at 16; *Larson,* 93 Wn.2d at 641. The Fourth Amendment and article 1, section 7 require that the seizure be reasonable. *Terry,* 392 U.S. at 16–19; *State v. Kennedy,* 107 Wn.2d 1, 4, 726 P.2d 445 (1986).

In *Terry,* the Supreme Court determined that the police could detain a suspect for an investigative stop even though the officer does not have probable cause to believe that the suspect is involved in criminal activity. *Terry,* 392 U.S. at 25–26.

> When police officers have a "well–founded suspicion not amounting to probable cause" to arrest, they may nonetheless stop a suspected person, identify themselves, and ask that person for identification and an explanation of his or her activities.

*State v. White,* 97 Wn.2d 92, 105, 640 P.2d 1061 (1982) (quoting *State v. Gluck,* 83 Wn.2d 424, 426, 518 P.2d 703 (1974)); *Brown v. Texas,* 443 U.S. 47, 51, 61 L. Ed. 2d 357,

99 S. Ct. 2637 (1979); *State v. Williams,* 102 Wn.2d 733, 740, 689 P.2d 1065 (1984); *State v. Wheeler,* 108 Wn.2d 230, 235, 737 P.2d 1005 (1987); *see Florida v. Royer,* 460 U.S. 491, 499–500, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983).

## OFFICERS HAD REASONABLE SUSPICION TO STOP APPELLANTS

■■ Reviewing the circumstances presented to the police, we hold that the investigating officers had reasonable suspicion to conduct a *Terry* stop of the appellants. Appellants' flight from the police constituted obstruction of a police officer in the exercise of his official duties.

In *Little,* the officers were dispatched to the Lakeshore Village Apartments to investigate a report of a group of juveniles loitering on the grounds of the apartment complex. Officer Colman testified that there were several juveniles in the area, not collected in a tight group but "milling about in general." Little Fact–Finding Hearing, at 23–24 (June 16, 1989). Upon seeing the officers the juveniles fled.

The circumstances presented to Colman, the criminal trespass investigation agreement, the report concerning loitering juveniles, the numerous posted signs warning against loitering, and Little's flight upon seeing Colman, provided Colman with substantial grounds of criminal activity to justify a detention. Little's refusal to stop when instructed to do so and his attempt to elude Colman by running into an apartment building and closing the door in the face of an officer constituted an obstruction of a police officer in the execution of his official duties.

In *Hayden* and *Davis,* the police officers were conducting a "premise check" of the apartment complex when they spotted a group of juveniles standing around a parked car. The officers testified that they did not recognize any of the youths as being residents of the complex and that they approached the group to conduct a criminal trespass investigation. Both officers testified that they were familiar with the residents of Lakeshore Village and could recognize

individuals who resided at the complex. Officer Rodgers testified that he spent approximately one–fourth of his shift each day at the apartments and that he knew the residents so well that if he did not recognize someone he was "99% reliable, if not completely reliable" in concluding that that person did not live there. Hayden/Davis Fact–Finding Hearing, at 45, 47 (May 8, 1989). As the officers approached, the juveniles began to disperse. Officer Saucier exited the patrol car and instructed the youths to stop. Hayden, Davis and another youth fled. The officers gave chase eventually apprehending the juveniles and arresting them for obstruction of a public servant.

The evidence supports the juvenile court's finding of guilt. The court specifically found that neither officer recognized any of the youths and that both officers were generally familiar with the residents of the complex. Findings of fact 4, 5. In his oral opinion, Judge Quinn stated

> The testimony is that the Police Officers routinely patrol the area. And that they visit as much as five times a day. And the other Officer indicated that he spends approximately one–fourth of his shift there and knows the area, to put it in his words, "like the back of his hand." In short, they both testified they are well acquainted with the physical set–up, and with the residents, most of whom they claim in their testimony, they recognize on sight.

Hayden/Davis Fact–Finding Hearing, at 65–66 (May 8, 1989). Based on the officers' familiarity with the residents, the posted warnings prohibiting trespassing and loitering, and the flight of the appellants, the officers had reasonable suspicion to believe that a criminal trespass was being committed and properly attempted to conduct an investigatory stop. Appellants refusal to stop when requested by the officers hindered, delayed and/or obstructed the officers in the discharge of their official duties.

## CONCLUSION

Under the Fourth Amendment and article 1, section 7, a police officer may conduct an investigatory stop if he has reasonable suspicion to believe that criminal activity is indicated. In the subject cases, the investigating officers

possessed sufficient suspicion to believe that appellants were involved in a criminal trespass of the apartment complex to justify an investigatory stop. Appellants' flight from the officers and refusal to stop when ordered to do so constituted an obstruction of a public servant.

We affirm Little's convictions for obstruction and criminal trespass, and Davis' and Hayden's convictions for obstruction.

DOLLIVER and DURHAM, JJ., and CALLOW, J. Pro Tem., concur.

GUY, J. (concurring)—The location in which the appellants were stopped was enclosed property subject to flagrant and recurring criminal trespass. It was not a common thoroughfare or public street. Based on the totality of the circumstances, the officers possessed a reasonable suspicion that the persons they attempted to stop were criminally trespassing on this private property. This suspicion did not need to rise to the level of probable cause for the stop orders to be justified. Nor are the officers required to suspect a felony or serious crime is being committed to justify a *Terry* stop.

While concurring, I would confine the majority's holding to the context of stops for criminal trespass. The background of these cases was a response by police officers to a chronic criminal trespass situation on enclosed premises familiar to the patrolling officers. This sets apart the majority analysis. The appellants were not stopped by the officers merely for loitering. They were not stopped solely for being in a high crime area. They were not stopped only because they were not recognized, although that may have contributed to their being approached. They were not stopped singly because of their flight in the presence of an officer. All these factors, along with the nature of the location, properly contributed to the officers' decisions to stop. The totality of the circumstances allowed experienced officers to make rational inferences, thus arousing suspicion of

criminal trespass. Within these limited parameters, the stops involved in these cases fell within the conduct permitted under *Terry* and its progeny.

The officers reasonably suspected the appellants of being on private property without permission, invitation, or authorization. In such instances, the location of a stopped party may help to justify the stop under *Terry*. People do not have to be observed flattening themselves against a wall to provoke reasonable suspicion of their unauthorized presence in a restricted area. Criminal trespass is no less committed by parties lingering in unauthorized areas than by parties skulking around in them. Criminal trespass cases may present ambiguous, unassuming conduct by suspected persons; it is the presence and not the attendant behavior that is the criminal conduct. Ambiguous conduct does not vitiate the validity of a *Terry* stop.

The officers articulated the reasons for their suspicion. These reasons might fail if the context of these stops was not a patrol of private enclosed property that has been in the experience of the officers subject to constant flagrant trespass. To deny law enforcement under these circumstances the ability to make a brief investigatory stop, however, would reduce the officer's function to that of a watchdog, able only to provoke flight at his or her approach, and unable to detain likely trespassers or to communicate intelligible warning to transgressors of their breach of the law.

BRACHTENBACH and ANDERSEN, JJ., concur with GUY, J.

UTTER, J. (dissenting)—The majority sets out the standard by which investigatory stops have been measured since *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), and then ignores it, giving police officers carte blanche to stop anyone based on their own subjective reasons. By ignoring those standards in this opinion and its companion case, *State v. Glover,* 116 Wn.2d 509, 806 P.2d 760 (1991), the majority creates the very real danger that

law enforcement officials will rely on these opinions and engage in conduct that is clearly below federal constitutional standards. In doing so, those officers may well commit reversible error in cases of far greater magnitude than these trespass cases. As Chief Justice Burger, writing for a unanimous court, noted in *Brown v. Texas,* 443 U.S. 47, 52, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979):

> In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference. The . . . statute under which appellant was stopped . . . is designed to advance a weighty social objective in large metropolitan centers: prevention of crime. But even assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it. When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.

443 U.S. at 52.

The United States Supreme Court has decreed that an investigatory stop can only be justified if there is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez,* 449 U.S. 411, 417, 66 L. Ed. 2d 621, 101 S. Ct. 690 (1981). The trial courts in the cases before us today made no findings that there were sufficient facts to justify a *Terry* stop. Even if such a finding had been made, a review of the record shows that, as a matter of federal law, the facts are insufficient to justify the stop. The convictions should therefore be reversed.

In oral argument before this court the prosecutor did not argue that the facts in these cases justify a *Terry* stop. Instead, she argued that *Terry* standards do not apply to minimal police intrusions in high crime areas. The Supreme Court flatly rejected that argument in *Brown v. Texas, supra.* What the prosecutor asked this court to do, and what the majority does without acknowledging it, is create a standard below that required by the federal courts, and

by the constitution. This we cannot do. The United States Supreme Court sets the minimum constitutional standards governing police stops of individuals. This court cannot go below those standards.

Both the majority and the trial courts in these cases seem to believe that the posting of a "No Loitering" sign somehow provides an officer with the basis for a *Terry* stop. There is no ordinance or statute prohibiting mere loitering because statutes prohibiting mere loitering are unconstitutional. *Papachristou v. Jacksonville,* 405 U.S. 156, 31 L. Ed. 2d 110, 92 S. Ct. 839 (1972); *State v. Martinez,* 85 Wn.2d 671, 675, 538 P.2d 521 (1975) ("[A] statute which simply proscribes 'loitering' is impermissibly vague because the word loiter standing alone does not necessarily connote sinister or illegal activity"), *overruled on other grounds in State v. Smith,* 93 Wn.2d 329, 336 n.2, 610 P.2d 869, *cert. denied,* 449 U.S. 873 (1980). Loitering is not trespassing and the act of loitering does not provide reasonable suspicion that the loiterer is trespassing. Therefore the mere presence of a "No Loitering" sign cannot be the justification for a *Terry* stop. Yet today, the majority allows laws which are otherwise constitutional to be enforced in an unconstitutional manner by targeting a specific group of people for the purpose of preventing their loitering in public housing projects, on the assumption that the only reason they would have for being there is to engage in criminal activity. Such a decision is repugnant to the constitution.

I

LITTLE

A

When the police first observed him, Little and a friend were walking across the apartment complex grounds. At the time Officer Colman was chasing several other individuals. Colman did not recognize Little as being one of the people in the group he was sent to investigate. At the moment Colman saw him, Little was doing nothing suspicious. In fact, Colman testified that at first he was not interested in

Little. Little Fact–Finding Hearing, at 13. Colman only became interested in him when Little started running. Colman then followed Little and ordered him to stop. At the moment Colman ordered him to stop, Little was seized within the meaning of the Fourth Amendment. *State v. Friederick,* 34 Wn. App. 537, 541, 663 P.2d 122 (1983). The question before this court is whether that seizure was reasonable.

*United States v. Cortez, supra,* establishes that reviewing courts must look at the totality of the circumstances presented to the arresting officer to determine whether a stop is reasonable. Under *Cortez,* "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez,* 449 U.S. at 417–18. Reviewing the totality of the circumstances surrounding the Little stop reveals that the stop was not reasonable.

The majority holds that "the criminal trespass investigation agreement, the report concerning loitering juveniles, the numerous posted signs warning against loitering, and Little's flight" justified the stop. Majority, at 496. These factors simply do not support the stop.[2]

First, the criminal trespass investigation agreement is a private agreement between the owners of the complex and the police department. That private agreement cannot be the basis for a stop that is prohibited by the constitution. It is a very dangerous idea to assert that constitutional protections can be subverted by such agreements. Under the constitution the police need articulable suspicion in order to stop someone. The State argued that the criminal trespass agreement gives the police the power to stop with less than an articulable suspicion. That agreement cannot give the police authority that the constitution forbids them. The

---

[2]The trial court seems to also have relied on the fact that Little ran into a building and attempted to shut a door on the officer. However, these events happened *after* the officer ordered Little to stop, and therefore cannot be used to justify that stop.

agreement itself does not provide articulable suspicion that any particular individual is engaged in criminal activity. Absent articulable suspicion, the stop is not justified.

Second, there is no evidence to indicate that Little was part of the group that the police were called to investigate. That group dispersed when the police arrived. Colman admitted that he did not know if Little had been a member of that group. Colman also admitted he did not know if Little lived in the complex. At the time he ordered Little to stop, Colman had no reason to believe Little was a part of the group the police were sent to investigate, and therefore the original call to the police cannot be part of the justification for stopping Little.

Third, the "No Loitering" signs have no bearing on the legitimacy of the stop. Little was not loitering when Colman first saw him. When Colman first saw him, Little was walking with a friend. Colman did not know if Little was a resident or the guest of a resident. At that moment he had no reason to suspect Little of loitering.[3]

Finally, Little's flight cannot, by itself, justify the stop. As outlined above, none of the other reasons given by the majority could have legitimately played a part in the officer's decision to seize Little. Colman stated that all he knew about Little was that "he was a black male in the area." Little Fact–Finding Hearing, at 21. The officer only became interested in Little when Little ran. Little Fact–Finding Hearing, at 13, 23. From the officer's testimony, it is clear that if Little had not run away the officer would not have stopped him. Applying the totality of the circumstances test, the only factors the officer could have considered when he decided to seize Little were: (1) Little is a black male, and (2) Little ran. Surely race cannot be a factor in justifying a stop. That leaves the majority only with flight as possible justification for the stop.

---

[3]Furthermore, there is no law against loitering. If Little was "loitering", he was simply violating an apartment policy and not breaking any law.

This court has never held that flight alone justifies a *Terry* stop. In *State v. Sweet*, 44 Wn. App. 226, 721 P.2d 560, *review denied*, 107 Wn.2d 1001 (1986), the Court of Appeals stated:

> Courts have generally regarded flight in the presence of police officers to be a circumstance that may be considered *along with other factors . . ..*

(Italics mine.) 44 Wn. App. at 230–31. Flight alone is not enough. In *Sweet*, the police saw a man standing "flattened" against a building late at night in an area where there was little or no traffic and all of the businesses were closed. He was near a truck that had been reported to the police as a suspicious vehicle. Under those circumstances, the fact that the suspect also ran when he saw the police could be considered in determining whether there was articulable suspicion that the man was engaged in criminal activity. 44 Wn. App. at 230. There simply are no circumstances like that in Little's case.

Little was simply walking with a friend. As he was walking the police chased a group of people past him. His friend took off running. The police officer looked at him. Under those circumstances it may have been entirely reasonable for Little to run. Whatever Little's motivation for running, the act itself does not justify the stop. *People v. Thomas*, 660 P.2d 1272, 1275 (Colo. 1983); *People v. Aldridge*, 35 Cal. 3d 473, 674 P.2d 240, 198 Cal. Rptr. 538, 541 (1984); 3 W. LaFave, *Search and Seizure* § 9.3(c), at 453 (2d ed. 1987); 1 W. Ringel, *Searches & Seizures, Arrests and Confessions* § 13.4(b)(3), at 13–35 (1990).

### B

A person is guilty of criminal trespass if he "knowingly enters or remains unlawfully in or upon premises of another". RCW 9A.52.080(1). A person "enters or remains unlawfully" in or upon premises of another if he is not "licensed, invited, or otherwise privileged" to be there. RCW 9A.52.010(3). The State must prove each element of a crime beyond a reasonable doubt. *In re Winship*, 397 U.S.

358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970). Therefore, to find Little guilty of criminal trespass, the State must prove beyond a reasonable doubt that Little was not licensed, invited, or otherwise privileged to be at the Lakeshore Village Apartments.

The trial court made no finding of fact that Little was unlawfully on the property, yet it convicted him of criminal trespass. In so doing the trial court relied on the fact that Little ran, that there were "No Loitering" signs posted, and that Little ran into a building and tried to shut the door on the officer. Little Fact–Finding Hearing, at 30. None of these factors support a finding that Little was unlawfully on the property. The trial court relieved the State of its burden by convicting Little without any evidence that at the time he was observed by the officer, Little was unlawfully on the property. Even if the officer had reasonable suspicion to stop the group of youths congregated in the complex, when the officer happened upon Little walking through the complex, he did not know whether Little was part of the original group. Thus, he had no specific suspicion with respect to Little. *See State v. Thompson,* 93 Wn.2d 838, 841, 613 P.2d 525 (1980) (the mere proximity to others independently suspected does not justify the stop). The officer admitted he had no idea whether Little might be trespassing. Little Fact–Finding Hearing, at 22. The only reason he had for ordering Little to stop is that Little ran away when he saw the officer.

Leaving the presence of a police officer, by itself, is not suspicious. *State v. Larson,* 93 Wn.2d 638, 645, 611 P.2d 771 (1980). Since the officer could articulate no specific, objective facts from which it could be reasonably inferred that Little was trespassing at the time the officer ordered him to stop, Little's detention violated the Fourth Amendment and Const. art. 1, § 7.

There was no competent evidence presented that Little was unlawfully on the premises. No rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Therefore the State failed to

sustain its burden of proof and Little's conviction for criminal trespass should be reversed.

A person is guilty of obstruction if he "knowingly hinder[s], delay[s], or obstruct[s] any public servant in the discharge of his official powers or duties". RCW 9A.76.020. Refusing to obey a police officer's order to stop may constitute obstruction. However, a person's refusal to stop cannot be the basis for criminal liability unless the officer has a legal basis for stopping that person. As discussed above, an officer may not stop an individual unless the officer has a reasonable suspicion based on "specific and articulable facts" that the person stopped is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *State v. Kennedy*, 107 Wn.2d 1, 4–6, 726 P.2d 445 (1986).

In this case the officer did not have specific and articulable facts to warrant a *Terry* stop. Therefore, Little had the right to refuse to cooperate with the officer. *United States v. Mendenhall*, 446 U.S. 544, 553, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980). Little's refusal to cooperate cannot provide the basis for his arrest or detention. *Terry v. Ohio, supra* at 34 (White, J., concurring); *State v. White*, 97 Wn.2d 92, 106, 640 P.2d 1061 (1982). It is illogical to maintain that a person has a right to refuse to cooperate with an officer and then to hold that the person who exercises that right is guilty of obstruction. Since the officer lacked the reasonable suspicion necessary to detain Little, Little's refusal to obey the officer's order cannot be obstruction. The obstruction conviction should be reversed.

## II
### DAVIS AND HAYDEN

Two police officers pulled into the parking lot at Lakeshore Village Apartments to conduct a "premise check". The officers noticed a group of about 10 young people standing in the parking lot. The officers testified that they did not immediately recognize anyone in the group as being one of the 500 or so residents of the complex. Therefore,

the officers decided to confront them to find out if they lived there. The 10 people started to walk away, and the officers ordered them to stop. At that point those 10 people were seized within the meaning of the Fourth Amendment. *State v. Friederick,* 34 Wn. App. 537, 541, 663 P.2d 122 (1983). The fact that Davis and Hayden then ran is irrelevant to the analysis of whether the initial stop was justified. The issue is whether the initial order to stop was reasonable.

The majority cites the "No Loitering" signs, the fact that the officers did not recognize Davis and Hayden, and the fact that Davis and Hayden ran as factors that justify the stop. For the reasons discussed above in the Little portion of this opinion, the fact that there were "No Loitering" signs is irrelevant. Additionally, appellants' decision to run cannot be used to justify the initial stop, since they ran *after* the order to stop. That leaves only the fact that the officers did not recognize Davis and Hayden as possible justification for the initial stop. That factor does not justify the stop. *Brown v. Texas,* 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979).

In *Brown v. Texas, supra,* police saw a man in an alley known as a hangout for drug dealers. The officers did not recognize the man as living in the neighborhood, so they decided to stop him. The Supreme Court said those were not sufficient grounds to justify the stop. 443 U.S. at 52. It is not enough that the person stopped is a stranger in the area, even when the area is one of high crime activity. There still must be "reasonable suspicion, based on objective facts" that the person stopped is engaged in criminal activity. 443 U.S. at 51. There simply is no such reasonable suspicion in Davis and Hayden's cases.

Under *Terry* the initial order to stop must be justified by reasonable and articulable suspicion that the appellants were engaged in criminal activity. Under the totality of circumstances approach mandated by the United States Supreme Court, it is clear that the initial stop of Davis and Hayden was unjustified, and therefore was unreasonable.

The only circumstance that the officers considered was that they did not immediately recognize Davis and Hayden. That factor cannot justify a *Terry* stop. Since the officers had no reasonable and articulable suspicion to stop Davis and Hayden in the first place, their decision to run cannot be construed as obstruction. Appellants' convictions should be reversed.

The police conduct which this court approves today is ripe for abuse. The Seattle Police Department's tactic of stopping and arresting young black males on Seattle Housing Project grounds, however well intentioned, has the potential for harassment. Amicus Curiae on behalf of Seattle–King County Public Defender Association reports that most of the cases against these juveniles are dismissed before trial. Brief of Amicus Curiae, at 11. Some individuals are cited for criminal trespass multiple times without ever being convicted. Brief of Amicus Curiae, at 12.

It is evident that the criminal trespass statute and the obstruction of a police officer statute are being used as antiloitering devices. The officer who arrested Little testified that he suspected Little of criminal trespass because he was loitering in the area. Report of Proceedings (Little), at 14. He further testified:

> [I]n one of those areas where the city has an agreement with the manager or owners of the building to have people not loiter in those areas, an officer will speak to those individuals and advise them that there is an Ordinance prohibiting them from loitering in the area . . ..

Report of Proceedings (Little), at 16. Even the prosecutor seems to believe that the criminal trespassing statute is an antiloitering device, calling it in the brief a loitering ordinance. Brief of Respondent (Little), at 13. As discussed above, there is no ordinance prohibiting mere loitering, and the private agreement between the managers of the complex and the police cannot create a law where one does not exist.

The court's holding today gives police unfettered discretion to stop someone, even without reasonable suspicion

that the person is engaged in criminal activity. The court has completely cut the Fourth Amendment's proscription against unreasonable searches and seizures from its moorings, an action which this court does not have the power to take. I do not discount the severity of the drug– and gang–related activity in today's society, but court sanctioned violation of constitutional rights is not an appropriate method of combating the problem. We must not cast aside constitutional protections and ignore individual rights in our attempts to combat crime. The convictions should be reversed.

SMITH, J., concurs with UTTER, J.

Reconsideration denied October 2, 1991.