110 P.3d 830 (2005)
STATE of Washington, Respondent,
v.
Dallas Anthony SILVA, Appellant.
No. 53264-2-I.
Court of Appeals of Washington, Division 1.
April 25, 2005.
*831 Douglas Hyldahl, Lester & Hyldahl, PLLC, Bellingham, WA, for Appellant.
Philip J. Buri, Special Deputy Prosecuting Attny., Craig D. Chambers, Kimberly Anne Thulin, Whatcom Cty Pros. Atty. Office, Bellingham, WA, for Respondent.
GROSSE, J.
¶ 1 Splicing into a line to divert electricity around a meter box, as here, constitutes tampering with an electrical line. We affirm.

FACTS
¶ 2 Dallas Anthony Silva is a contractor who owned two houses in Whatcom County, one on Sudden Valley Drive (Sudden Valley) and one on Hunsicker Street (Hunsicker). On October 30, 2001, while investigating a shooting at the Sudden Valley house, sheriff's officers discovered a marijuana grow operation. The shooting victim was the tenant of Silva's Sudden Valley house. The tenant told officers he tended the grow operation in exchange for a portion of the profits and as payment of rent. Officers determined that the power to run the grow operation came from a line spliced off the main power cable *832 prior to it reaching the electric meter for the residence. It was also determined that the spliced wire was not owned by Puget Sound Electric (PSE) and color differences were noted between the ground wire owned by PSE and that of the new line spliced into it. Silva was charged and convicted with the unlawful manufacturing of a controlled substance. That conviction is not directly at issue here.
¶ 3 A couple of days after the investigation at the Sudden Valley location began, a search warrant issued for Silva's Hunsicker residence. There, officers discovered a grow operation under construction similar to the one on Sudden Valley, but not yet growing plants. As at the other house, investigators found a breaker box at the Hunsicker location into which a line had been added from a splice in the main line. The second breaker box had been installed and the power diverted through it so that it did not register usage on the main electric meter at the house. This spliced line had power running through it.
¶ 4 PSE sent electricians to the Hunsicker house to confirm the diversion of electricity. PSE workers located a splice in the main cable, five feet from the new breaker box, and seven feet underground. The new cable connected to the second breaker box and was the same type used at the Sudden Valley house. PSE said it did not make the splice, and noted the splice was wrapped in the same type of tape as that found on the splice at the Sudden Valley location.
¶ 5 Several months later Silva was charged with defrauding a public utility in the first degree for diverting electricity at the Hunsicker house with the intent of furthering other criminal activity. After a bench trial on stipulated facts, Silva was convicted of the charge.
¶ 6 Silva appeals, arguing (1) the State failed to prove he tampered with the utility line, (2) there was insufficient evidence that the diversion was in furtherance of other criminal activity, and (3) his right to a speedy trial was violated because the incomplete grow operation on Hunsicker was the same criminal conduct as the completed operation on Sudden Valley for which he had been charged 10 months earlier.

ANALYSIS[1]
¶ 7 Silva first claims the trial court erred by failing to specifically enter a finding on an element of the crime of defrauding a public utility in the first degree.[2]
¶ 8 RCW 9A.61.020 sets forth the meaning of "[d]efrauding a public utility." The statute states:
"Defrauding a public utility" means to commit, authorize, solicit, aid, abet or attempt to:
(1) Divert, or cause to be diverted, utility services by any means whatsoever;
(2) Make, or cause to be made, a connection or reconnection with property owned or used by the utility to provide utility service without the authorization or consent of the utility.
(3) Prevent a utility meter or other device used in determining the charge for utility services from accurately performing its measuring function by tampering or by any other means;

*833 (4) Tamper with property owned or used by the utility to provide utility services; or
(5) Use or receive the direct benefit of all or a portion of the utility service with knowledge of, or reason to believe that, the diversion, tampering, or unauthorized connection existed at the time of the use or that the use or receipt was without the authorization or consent of the utility.
¶ 9 Silva was charged under RCW 9A.61.030(1)(b), which states:
(1) A person is guilty of defrauding a public utility in the first degree if:
...
(b) Tampering has occurred in furtherance of other criminal activity.
¶ 10 Silva argues the statute requires proof that tampering occurred in furtherance of other criminal activity, but claims the findings and conclusions of the trial court only set forth that he diverted the electrical power and that the diversion was in furtherance of other criminal activity.[3] Thus, he argues that although the trial court entered findings and conclusions, it failed to properly address the necessary element of tampering in its findings and conclusions.[4]
¶ 11 RCW 9A.61.010(2) defines "[d]ivert" as "to change the intended course or path of electricity, gas, or water without the authorization or consent of the utility." RCW 9A.61.010(5) defines "[t]amper" as "to rearrange, injure, alter, interfere with, or otherwise prevent from performing the normal or customary function." Contrary to Silva's argument, the two are not necessarily mutually exclusive and the meaning of the words partially overlap.
¶ 12 The statutory elements of the crime of defrauding a utility in the first degree can be met by one of two acts. First, someone could divert utility services worth more than $1,500.[5] That is not at issue here. The second prohibited act, the one charged here, is the tampering with utility services to further an additional crime. The perpetrator must tamper with the utility service with the unlawful intent to commit a further crime.
¶ 13 The definition of tamper includes rearranging, altering, or interfering with the providing of utility services. This broad definition of tampering includes a specific form of doing so, diverting. While it is possible to tamper with an electrical line without diverting electricity, given the statutory definitions it is virtually impossible to divert the electricity in the manner accomplished here without tampering with the electrical line. The diversion here was accomplished by rearranging, altering, or interfering with the electrical line.
¶ 14 A review of the record shows sufficient evidence to support a finding and conclusion of tampering. The findings and conclusions in this case, though not a model of clarity, when read as a whole, support the determination that Silva tampered with the electrical line even though they are couched in terms of "diversion."[6]
¶ 15 Silva claims that even if there is sufficient evidence to support a finding that he tampered with the line, there is insufficient evidence to show that it "occurred in furtherance of other criminal activity"[7] in order to support a conviction for defrauding the utility in the first degree. The trial court held that Silva diverted the electrical power at the Hunsicker residence for the purpose of growing marijuana, even though the Hunsicker location was not yet fully operational. The court broke down its reasoning into two parts: (1) that Silva could "power up" without drawing attention to his grow operation's high power use; and (2) that Silva could avoid paying a huge electric bill because the *834 operation would draw so much current.[8] The court analogized the case to conspiracy cases wherein a substantial step toward committing the crime is all that is required to complete it.
¶ 16 Taking the evidence in the light most favorable to the State there is significant evidence that Silva was building a second illegal marijuana grow operation. Although there were no plants at the Hunsicker location there were other indicia of his intent to complete a grow operation. Silva is a contractor who possessed the knowledge and equipment to perform the diversion. Significant evidence of the construction of a grow operation was found at the Hunsicker location, including tools, wiring, tin duct pipe, blowers and wood framing. The windows were covered with plywood so the bright light of a grow operation would not be noticed from outside, and a pulley system similar to that used at Sudden Valley to lower and raise grow lights was in place. The cable used to divert electricity at the Hunsicker location and the electrical tape used to wrap the splice were identical to that used at Sudden Valley. The inferences must be drawn in favor of the State. There is substantial evidence to allow a trier of fact to find the element of the tampering "in furtherance of other criminal activity"[9] beyond a reasonable doubt.
¶ 17 Finally, Silva claims the trial court erred in denying his motion to dismiss for violation of his speedy trial right under CrR 3.3, that the charge was not tried in a timely manner. Silva asserts that he was charged with multiple crimes arising from the same criminal episode. Application of a court rule to a particular set of facts is a question of law, which this court reviews de novo.[10]
¶ 18 CrR 3.3 confers a right to a defendant to be brought to trial within 90 days of the arraignment if he or she is out of custody. The right is 60 days if the defendant is incarcerated. Where multiple charges stem from the same criminal conduct, the time for trial begins on the date the defendant was held to answer on the first of the charges.[11] The purpose of this rule is to prevent "`prosecutors from harassing a defendant by bringing successive charges over a long span of time even though all charges stem from the same criminal episode.'"[12] The Lee case holds that only offenses based on the same conduct or conduct involving a single criminal incident or episode are related offenses.[13] "`Merely because some of the allegedly criminal activity was the same [or forms a common scheme] is not enough to conclude all the offenses are based on the same conduct.'"[14]
¶ 19 Here, the lower court properly rejected Silva's motion to dismiss because the charge of defrauding a public utility (August 9, 2002) is not based on the same conduct as his earlier conviction for manufacturing a controlled substance (earlier arraignment date of November 16, 2001). The actions underlying the two charges had different purposes and did not involve the same victim or victims. The actions occurred at two separate locations. The subsequent prosecution of Silva for defrauding a public utility did not violate CrR 3.3.
¶ 20 Affirmed.
WE CONCUR: SCHINDLER and COLEMAN, JJ.
NOTES
[1] The usual standard of review applies. On a challenge to the sufficiency of the evidence, this court views the evidence in the light most favorable to the prosecution and determines whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992); State v. Green, 94 Wash.2d 216, 220-22, 616 P.2d 628 (1980). All reasonable inferences are drawn in the State's favor and are interpreted against the defendant. State v. Gentry, 125 Wash.2d 570, 597, 888 P.2d 1105 (1995). This standard applies whether the case is tried to a jury or to the court. State v. Rangel-Reyes, 119 Wash.App. 494, 499, 81 P.3d 157 (2003) (citing State v. Little, 116 Wash.2d 488, 491, 806 P.2d 749 (1991)). Elements of a crime may be established by either direct or circumstantial evidence and circumstantial evidence is no less reliable than direct evidence. State v. Myers, 133 Wash.2d 26, 38, 941 P.2d 1102 (1997).
[2] In criminal cases tried to the court without a jury, the court is required to enter written findings of fact and conclusions of law. CrR 6.1(d). Those findings must address each element of the crime separately and indicate the factual basis for each element. State v. Banks, 149 Wash.2d 38, 43, 65 P.3d 1198 (2003).
[3] Clerk's Papers at 23-24.
[4] Silva claims there is no evidence in the record to support the omitted necessary finding and thus asserts reversal and dismissal of the charge is required. He admits, however, that if sufficient evidence in the record establishes that the State met its burden of proof, the case may be remanded for revision of the finding.
[5] RCW 9A.61.030(1)(a).
[6] Findings of fact and conclusions of law must be sufficient to suggest the factual basis for the ultimate conclusion. Marriage of Lawrence, 105 Wash.App. 683, 686, 20 P.3d 972 (2001).
[7] RCW 9A.61.030(1)(b).
[8] Clerk's Papers at 26-27.
[9] RCW 9A.61.030(1)(b).
[10] State v. Kindsvogel, 149 Wash.2d 477, 480, 69 P.3d 870 (citing State v. Ledenko, 87 Wash.App. 39, 42, 940 P.2d 280 (1997)).
[11] State v. Peterson, 90 Wash.2d 423, 431, 585 P.2d 66 (1978).
[12] Kindsvogel, 149 Wash.2d at 482, 69 P.3d 870 (quoting State v. Lee, 132 Wash.2d 498, 503, 939 P.2d 1223 (1997)).
[13] Lee, 132 Wash.2d at 502-03, 939 P.2d 1223.
[14] Kindsvogel, 149 Wash.2d at 482, 69 P.3d 870 (quoting Lee, 132 Wash.2d at 505, 939 P.2d 1223).