# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON , Respondent, v. AARON JUSTIN CALLOWAY, Appellant. | No. 78899-0-I DIVISION ONE UNPUBLISHED OPINION FILED: February 10, 2020 |

APPELWICK, C.J. — Calloway appeals his judgment and sentence. He argues that a police officer's investigatory stop of him was unlawful, and that the evidence that flowed from it should have been suppressed. We affirm.

## FACTS

While on a routine patrol, Tulalip Tribal Police Patrol Sergeant Jeremy Mooring observed Aaron Calloway walk into a derelict property on Old Tulalip Road. Sergeant Mooring knew from experience that the area was a high narcotics area. The specific property was known for squatters and substance abusers. The owners of the house had entered into an agreement with the Tulalip Tribe for assistance in enforcing trespassing ordinances. The agreement provided that only two individuals, Calvin Hatch and a male who goes by the name of "Boo Boo," were allowed to stay on the property. Hatch and Boo Boo were allowed to have visitors. The property owners granted tribal police the right to enter the property for the purpose of identifying and removing all others from the property.

Sergeant Mooring approached the house and knocked on the door. A female voice answered, asking who was there. Sergeant Mooring responded, "It's the police. Nobody's supposed to be in this house." He received no further response. Sergeant Mooring walked around the backside of the house to investigate the rear entrance. He then heard the front door close. He moved back towards the front of the home to investigate, and observed Calloway walking away from the home towards the street. Sergeant Mooring followed and observed Calloway proceed down the street to a recreational vehicle (RV), pick up a bicycle off the ground near the RV, and attempt to ride away. Sergeant Mooring called out to him, "How you doin' partner? Come over here and talk to me for a second." Sergeant Mooring testified that, at the time, he was suspicious that Calloway had committed two counts of trespass and potentially stolen the bike. Calloway then peddled towards Sergeant Mooring.

Sergeant Mooring asked Calloway what he was doing at the house. Calloway responded that he was "stopping by to see my friend Boo Boo." Sergeant Mooring asked if Boo Boo was in the house. Calloway responded, "Yeah I just went in there to say hi to him." Sergeant Mooring then stated, "That's it? For 30 seconds? That's consistent with running dope, man." Calloway denied this, saying, "[N]o, it's consistent with they said nobody can be in the house." He said that he did not know that no one was allowed in the house.

Sergeant Mooring then asked Calloway if he had identification. Calloway responded that he did, and reached into his pocket to retrieve it. While Calloway did this, Sergeant Mooring asked him if the bike that he was riding was his.

2

Sergeant Mooring pointed out that Calloway had originally approached the house on foot from a different direction, but was now leaving on a bike that he had not come with. Calloway responded that it was "his friend's bike. I'm using it. It's fine." Calloway then handed Sergeant Mooring his identification card. He disclosed to Sergeant Mooring that he had a misdemeanor warrant in Fife. At that point, Sergeant Mooring called in Calloway's information over his radio.

The two continued to converse while police looked into the warrant. During this time, another officer arrived at the scene. After two more officers arrived, Sergeant Mooring indicated that he had been told to arrest Calloway on the basis of the Fife warrant. He told Calloway that he was being placed under arrest for the warrant and handcuffed him. During the search incident to arrest, Sergeant Mooring recovered a scale, a needle, and a bag of methamphetamine from Calloway's pockets.

The State charged Calloway with possession of a controlled substance. Calloway contended that the stop was unlawful and moved to suppress all evidence gathered as a result. The trial court denied the motion, finding that Sergeant Mooring had reasonable and articulable suspicion sufficient to support the investigatory stop. The trial court found Calloway guilty as charged.

Calloway appeals.

## DISCUSSION

Calloway argues that the trial court erred in denying his motion to suppress the evidence seized as a result of Sergeant Mooring stopping him. He claims that Sergeant Mooring was unable to articulate reasonable suspicion that he was

engaged in criminal activity. As a result, he contends that his detention was unconstitutional from its inception, and that all evidence that flowed from it should have been suppressed.

Generally, under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution, an officer may not seize a person without a warrant. State v. Fuentes, 183 Wn.2d 149, 157-58, 352 P.3d 152 (2015). A seizure occurs when, considering all the circumstances, an individual's freedom of movement is restrained and the individual would not believe he or she is free to leave or decline a request due to an officer's use of force or display of authority. State v. Harrington, 167 Wn.2d 656, 663, 222 P.3d 92 (2009). An officer may, without a warrant, briefly detain a person for questioning if the officer has reasonable suspicion that the person stopped is engaged in criminal activity. Fuentes, 183 Wn.2d at 158.

Reasonable suspicion must be based on specific and articulable facts. Id. To determine the reasonableness of an officer's suspicion, a reviewing court must look at the totality of the circumstances known to the officer at the time of the stop. Id. The exclusionary rule mandates the suppression of evidence obtained as the direct result of an unlawful detention. See State v. Garvin, 166 Wn.2d 242, 254, 207 P.3d 1266 (2009). In reviewing the denial of a motion to suppress, we review the trial court's conclusions of law de novo and its findings of fact used to support those conclusions for substantial evidence. Fuentes, 183 Wn.2d at 157.

I. Seizure

The trial court found that a seizure occurred when Sergeant Mooring asked for Calloway's identification card. Calloway contends that the seizure occurred when the officer initially stopped him. The State concedes this point. That concession is well taken.

The trial court characterized the initial contact between Sergeant Mooring and Calloway as "social," because Sergeant Mooring "asked" Calloway to come over. This characterization is consistent with the trial court's finding of fact 12, that the officer initiated contact with the words, "'[H]ow you doing partner? Why don't you come over here and talk to me a sec[ond]?'" The trial court did not find that a seizure occurred until Sergeant Mooring asked for Calloway's identification.

Finding of fact 12 is not supported by substantial evidence. Sergeant Mooring testified that he initially "asked" Calloway to come talk to him. However, his body camera records him saying "How you doin' partner? Come over here and talk to me for a second," rather than "'[H]ow you doing partner? Why don't you come over here and talk to me a sec[ond]?'" A reasonable person would interpret the latter as a request, but the former as a command. This is especially so because Calloway had just exited a property after Sergeant Mooring had informed the occupants that no one was allowed to be there. Under the circumstances, a reasonable person would not feel free to disobey a police officer's command to talk to him. See State v. Fredrick, 34 Wn. App. 537, 541, 663 P.2d 122 (1989) (officer seized a suspect by saying, "'Stop, I want to talk to you.'").

We reverse the trial court's finding that Calloway's seizure did not begin until Sergeant Mooring asked for his identification. We instead find that Calloway's detention began when Sergeant Mooring initially stopped him. We evaluate the reasonableness of the stop based on the facts known to Sergeant Mooring at that point in time. See State v. Gatewood, 163 Wn.2d 534, 540, 182 P.3d 426 (2008).

II. Reasonable Suspicion

Calloway argues that Sergeant Mooring's seizure was not justified by reasonable suspicion.

Sergeant Mooring testified that he stopped Calloway on suspicion of two counts of trespass and theft of a bike. Sergeant Mooring had personally observed Calloway walk across private property to enter a house on different private property. The owners of the house that Calloway entered had requested that police document and remove any person on that property except for two male individuals and their visitors.[1] Sergeant Mooring knew what the two people who were authorized to stay at the house looked like, and Calloway wasn't one of them. When Sergeant Mooring knocked on the door to investigate, a female voice answered. When he identified himself as a police officer, he received no further

---

[1] When asked why Sergeant Mooring said "no one was allowed" in the house when there were two lawful occupants, Sergeant Mooring responded,

> Calvin's allowed to stay there and Boo Boo. And then anybody else, from my knowledge, . . . there were several people that were trespassed, but I didn't have access to the photographs and names at that time. So when I just announced it generally that nobody's allowed to be there other than Calvin and Boo Boo that was just my understanding nobody's supposed to be staying there. Calvin and Boo Boo can have visitors, but nobody's -- you know, takes care of the squatting problem.

response. Sergeant Mooring then walked around to the back of the house. Calloway exited the property while Sergeant Mooring was in the backyard. He left through the front door and headed to the road, rather than retrace the steps of his arrival. And, out on the road, he picked up a bicycle from beside an RV and began to ride it away. This course of conduct raised a reasonable suspicion that Calloway was trespassing, attempting to avoid apprehension, and stealing a bicycle in the process.

Calloway argues that this is not enough information to suspect theft of the bicycle. He points out that Sergeant Mooring testified to knowing nothing about the bike or its owner, only that there were bikes piled up at the RV, but that he had no idea whether they were stolen or not. But, we don't look at these facts about the bicycle in isolation. Under the totality of the circumstances, it was reasonable for Sergeant Mooring to believe that Calloway was taking a bike that did not belong to him.

Calloway raises the lack of signage or fencing around the property indicating that trespassers were not allowed. He contends that this differentiates Calloway's case from cases like State v. Glover, 116 Wn.2d 509, 511-12, 806 P.2d 760 (1991), and State v. Little, 116 Wn.2d 488, 490-91, 806 P.2d 749 (1991). Each of those cases involved officers stopping trespassers at the Lakeshore Village Apartments. Little, 116 Wn.2d at 490; Glover, 116 Wn.2d at 511. The complex was surrounded by fencing topped with concertina wire, no trespassing signs, and had an armed security guard at the main entrance. Little, 116 Wn.2d at 490. Similar to the facts here, management had also entered into an agreement with

7

the Seattle Police Department to investigate persons who were suspected of being trespassers. Id.

The court in Little considered the security and no trespassing signs to be a factor that contributed to the officer's reasonable suspicion.[2] Id. at 497. However, in both Little and Glover, the most significant factor was the officers' familiarity with the complex residents, combined with their unfamiliarity with the trespassers. Little, 116 Wn.2d at 497; Glover, 116 Wn.2d at 514. This gave the officers reasonable suspicion that a trespass was occurring. Little, 116 Wn.2d at 497; Glover, 116 Wn.2d at 514. Here, Sergeant Mooring's reasonable suspicion of Calloway's conduct was not negated by the fact that there were no signs prohibiting trespassers. Sergeant Mooring knew that only two individuals were allowed to occupy the property, knew who they were, and knew that Calloway was not one of them. This fact, combined with Calloway's departure from the property and his attempt to avoid Sergeant Mooring, who had identified himself as an officer and stated no one was supposed to be there, provided sufficient reasonable suspicion to justify an investigatory stop.

Calloway argues in the alternative that even if the seizure was lawful at the time, whatever reasonable suspicion Sergeant Mooring had of him trespassing dissipated at the beginning of their conversation. To do so, he relies on the conversation occurring after the lawful seizure. When Sergeant Mooring asked him what he was doing at the house, Calloway responded that he was "see[ing]

---

[2] The Glover court does not mention the various security measures in its analysis of the reasonableness of the investigatory stop. 116 Wn.2d at 514.

my friend Boo Boo." Calloway claims that this should have dissipated Sergeant Mooring's suspicion because it was clear that he was a guest of a permitted occupant and therefore not trespassing. This is not so. All that Calloway's response proves is that he knew that Boo Boo lived at the house. It was reasonable for Sergeant Mooring's suspicion to remain because, if Boo Boo were in the house, he would have likely responded when Sergeant Mooring identified himself as the police. And, Boo Boo would have told Calloway he was free to remain as his guest. Instead, the only responses were a woman's voice and Calloway's attempt to escape the property without detection. The suspicion of trespass had not attenuated.

Calloway seeks to analogize this case to Fuentes. In that case, police suspected criminal activity when Sandoz entered an apartment and remained for about 15 minutes before leaving. Fuentes, 183 Wn.2d at 159. The area was known for drugs, and the owner of the apartment complex had given police permission to expel "loiterers." Id. at 155. The Washington Supreme Court overruled the trial court's finding of reasonable suspicion primarily because Sandoz's conduct was more indicative of being a visitor than a loiterer. Id. 160-61.

In contrast to Fuentes, the owners of the property here instructed police to identify and remove all individuals from the property except for two people, and their visitors. Calloway was not one of the two authorized persons and Sergeant Mooring did not otherwise recognize him. This is much more specific than a simple "no loitering" policy. Also, Sergeant Mooring had reason to believe that Calloway

was not an authorized guest. Neither he nor Boo Boo responded when Sergeant Mooring knocked on the door and announced himself, and he instead sought evade detection by police by leaving. These crucial differences provide the reasonable suspicion necessary to justify Sergeant Mooring's investigatory stop of Calloway.

The seizure was supported by an articulable suspicion based on a totality of the circumstances. Part of Sergeant Mooring's mandate was to identify and document anyone on the property who was not an authorized person. It was a reasonable investigatory next step to ask for Calloway's identification for documentary purposes. At that point, Calloway volunteered that he had a warrant out for his arrest, which provided reasonable grounds to continue to hold him while Sergeant Mooring checked the warrant. The warrant provided the basis for the arrest. The trial court did not err in not suppressing the evidence at issue.

We affirm.

Appelwick, C.J.

WE CONCUR:

10