[No. 25726-9-I.   Division One.   April 13, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. STEVEN
DOUGLAS BLAIR, *Petitioner.*

*Constance Marie Dillon* and *Patricia Novotny* of *Washington Appellate Defender Association,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Cheryl B. Carey, Deputy,* for respondent.

AGID, J. — Steven Blair appeals the trial court's denial of his motion to suppress evidence seized pursuant to a search incident to his arrest for criminal trespassing. Blair contends that the police lacked probable cause to believe he committed a crime. He further argues that the criminal trespass ordinance, Seattle Municipal Code (SMC) 12A.08.040, is unconstitutionally overbroad and void for vagueness. Because we hold that the police lacked probable cause to arrest Blair, we do not reach the constitutional issue.

## I
### FACTS

On September 1, 1989, Blair was walking into the Roxbury Housing Village (Roxbury Village) when he was stopped and arrested by Seattle Police Officer Dale Williams for criminal trespass. Officer Williams searched Blair incident to the arrest and found a plastic bottle containing rock cocaine. The State charged Blair with possession of cocaine in violation of the Uniform Controlled Substances Act, RCW 69.50.401(d). Blair moved to suppress the evidence on the ground that the police lacked probable cause to arrest him. After holding a suppression hearing, the trial court denied the motion.

Roxbury Village is a public housing complex owned and operated by the Seattle Housing Authority (SHA). Experiencing problems with drug dealing, drug use, trespassing and other disturbances, the management of Roxbury Village posted signs on each building in the complex stating "No Trespassing — Any illegal activity or loitering is prohibited in this area. Seattle Housing Authority." The signs are visible from all parking lots and entryways. The SHA also entered into an agreement with the Seattle Police Department (SPD) authorizing the SPD to warn and arrest anyone trespassing on the premises. Officer Williams testified that the agreement allows him to "admonish" any person who he believes has engaged in illegal activity or who has been arrested on the premises of Roxbury Village. The officer admonishes the person not to return to Roxbury Village or he or she will be arrested for trespassing.

On August 8, 1989, Officer Williams arrested Blair in a Texaco station parking lot near Roxbury Village for allegedly engaging in a drug transaction. Blair was convicted of possession of narcotics. Prior to that arrest, Officer Williams saw Blair participate in what he believed was a drug transaction on the premises of Roxbury Village. Officer Williams did not investigate that incident because there were several men present and he had no backup. During the August 8 arrest, Officer Williams admonished Blair not to return to Roxbury Village.[1] On September 1, 1989, Blair was walking into Roxbury Village with a friend when Officer Williams pulled up in his patrol car and directed Blair to get in the car. Blair testified that he responded, "But I'm not doing anything, I'm just coming to get my hair braided." Officer Williams did not attempt to find out whether Blair was on the premises for a legitimate purpose. He placed Blair under arrest and searched him.

---

[1] Blair contends that he was never admonished by Officer Williams or any other police officer. However, appellant does not assign error to any of the trial court's findings of fact, including its finding that Officer Williams admonished Blair on August 8, 1989.

Blair testified that on September 1, 1989, he was going to visit a girl named Freda who had agreed to braid his hair. He indicated on a diagram of the housing complex which unit Freda lived in, but he was not sure of the unit number. He also did not know Freda's last name. Blair believed that she may have been staying with the family who lived in the unit. The Roxbury Village manager, Virginia Bock, testified that Freda's name did not appear on her list of residents. She acknowledged, however, that the list only includes residents, not the names of guests staying with residents.

## II

### DISCUSSION

Former SMC 12A.08.040 provides in part:

A. A person is guilty of criminal trespass in the first degree if he or she knowingly enters or remains in a building when he or she is not then licensed, invited, or otherwise privileged to so enter or remain.

B. A person is guilty of criminal trespass in the second degree if he or she knowingly enters or remains in or upon premises of another under circumstances not constituting criminal trespass in the first degree.

Under the ordinance, if a person is not licensed, invited or otherwise privileged to enter or remain on the premises of Roxbury Village, he or she is guilty of second degree criminal trespass.

Blair first contends that Officer Williams could not have had probable cause to arrest him for trespassing because he was arrested on a public sidewalk where he had every right to be. Blair apparently believes that sidewalks within the housing project are open to the general public because the project is owned and managed by the City of Seattle, a public corporation. *See* RCW 35.82.030.

The State may control the use of its property so long as the restriction is for a lawful, nondiscriminatory purpose. *Adderley v. Florida*, 385 U.S. 39, 47, 17 L. Ed. 2d 149, 87 S. Ct. 242 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."). Here, the

SHA is legislatively mandated to provide decent, safe and sanitary dwellings for low income individuals. RCW 35.82-.020(9). The SHA's policy of restricting access to its property by excluding those engaging in illegal activities on the premises serves only to further this legislative mandate and therefore cannot be seen as discriminatory. Moreover, the SHA is not operating the apartment complex for the general public. Rather, it is providing housing for the residents of the complex. Thus, in attempting to discourage criminal activity by posting no trespassing signs, the management of Roxbury Village is acting no differently than management of a privately owned apartment complex would act.[2]

In *State v. Little*, 116 Wn.2d 488, 806 P.2d 749 (1991), the management of a publicly owned apartment complex took the same steps taken by the SHA in this case to deal with problems of drug and gang activity. Although the complex was publicly owned,[3] no issue was raised as to whether the management could legally restrict access to the premises. In his concurring opinion, Justice Guy observed that the complex was not open to the general public:

> The location in which the appellants were stopped was enclosed property subject to flagrant and recurring criminal trespass. It was not a common thoroughfare or public street.

*Little*, 116 Wn.2d at 498. Roxbury Village should not be viewed any differently than the public housing project in *Little* just because it has not been enclosed with a concertina wire fence. The "No Trespassing" signs were sufficient to inform people that the complex is not open to the general public absent an invitation from a resident to visit the premises. *See also Fox v. State*, 580 So. 2d 313 (Fla. Dist. Ct. App. 1991) (manager of public housing project had authority

---

[2]The notion that tenants of a publicly funded housing project are entitled to less protection and have fewer rights to restrict uninvited visitors from entering the premises than tenants of a privately owned apartment complex is not only offensive, but it also finds no support in the law.

[3]*See Little*, 116 Wn.2d at 501 (Utter, J., dissenting).

to enlist assistance of police in warning trespassers to leave the premises).

■■ Having decided that the SHA can legally restrict access to its property, the next question is whether Officer Williams' prior admonishment not to return, coupled with Blair's return to the restricted premises, constituted probable cause to arrest Blair for criminal trespass. Police have probable cause to arrest when "there is reasonable ground for suspicion, supported by circumstances within the knowledge of the arresting officer, which would warrant a cautious person's belief that the individual is guilty of a crime." *State v. Green*, 91 Wn.2d 431, 436, 588 P.2d 1370 (1979). It is an affirmative defense to criminal trespass that "[t]he actor reasonably believed that the owner of the premises, or other person empowered to license access thereto, would have licensed him or her to enter or remain". Former SMC 12A.08.040(E)(3).[4] Thus, whether Officer Williams had probable cause to believe that Blair was committing a crime depends on whether the circumstances known to the officer indicated that Blair was not on the property for legitimate purposes.

Officer Williams arrested Blair as he was entering Roxbury Village. He had not seen Blair loitering on the property or exhibiting other behavior which might lead a reasonable person to believe that Blair was not on the property to visit a resident or guest on the day of the arrest. Officer Williams simply drove up to Blair and ordered him into the police cruiser where he arrested him. Had Officer Williams taken a moment to ask Blair where he was going and for what purpose, he could have determined whether Blair was in fact visiting a friend or was trespassing.[5]

---

[4] Both Officer Williams and Bock acknowledged that if Blair were entering Roxbury Village for a legitimate purpose, *i.e*, to visit a resident or guest of a resident, the agreement authorizing Seattle police officers to arrest trespassers would not permit Officer Williams to arrest Blair for criminal trespass.

[5] The trial court found that Blair was not on the premises on September 1 to visit anyone named Freda, and that in all probability, Freda did not reside at Roxbury Village.

Because he knew Blair did not live in Roxbury Village, had admonished Blair not to return and had arrested him nearby for a drug transaction, Officer Williams had an articulable suspicion that Blair might be trespassing on September 1. Based on this information, Officer Williams could properly stop Blair, ask him why he was on the premises, and investigate to see if his purpose for being there was in fact legitimate. *See Little*, 116 Wn.2d at 496. However, the fact that the officer had told Blair not to return to the premises does not, in itself, create probable cause for arresting him on the charge of criminal trespass.[6]

Nor can we find that the officer's conduct in this case was justified on any other ground. The fact that the officer had a basis for believing that Blair was trespassing did not give rise to reasonable suspicion that he was in possession of narcotics. *See State v. Glover*, 116 Wn.2d 509, 516, 806 P.2d 760 (1991) (Guy, J., concurring). During a *Terry* stop, a limited search for weapons is warranted when the investigating officer has reason to believe the suspect is armed and dangerous, *Terry v. Ohio*, 392 U.S. 1, 30, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Here, however, the officer had no reason to suspect that Blair might be armed and dangerous. Therefore, had Officer Williams conducted an investigatory stop, a search incident to the stop would not have been justified.[7]

---

[6]We sympathize with the efforts of the SHA and SPD to combat criminal activity in public housing complexes. However, were we to adopt the State's interpretation of the ordinance and the agreement between SPD and the SHA, either or both might well be unconstitutional on overbreadth and vagueness grounds. The State essentially asks this court to expand the holdings of *Little* and *State v. Glover*, 116 Wn.2d 509, 806 P.2d 760 (1991) by ruling that the combination of circumstances justifying an investigatory stop in those cases is also sufficient, without a prior investigation, to create probable cause to arrest a nonresident of the apartment complex. There is no authority for such an expansion.

[7]Of course, had the officer concluded after questioning Blair and investigating his story that he was not there for any legitimate purpose, the officer would have had probable cause to arrest Blair, and the search incident to the arrest would have been lawful. *State v. Henneke*, 78 Wn.2d 147, 149, 470 P.2d 176 (1970).

Because Officer Williams lacked probable cause to arrest Blair, the trial court should have suppressed the cocaine seized in the search incident to the arrest. *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *Mapp v. Ohio*, 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A.L.R.2d 933 (1961). The order denying suppression of the evidence is reversed.

GROSSE, C.J., and WEBSTER, J., concur.