[No. 67451-5.   En Banc.]
Argued November 27, 2001.       Decided June 6, 2002.

THE CITY OF BREMERTON, *Respondent*, v. KARL WIDELL, *Petitioner*.

THE CITY OF BREMERTON, *Respondent*, v. LARRY BLUNT, *Petitioner*.

*W. David Rovang* and *Eric M. Fong* (of *Rovang Fong & Associates*), for petitioners.

*Pamela B. Loginsky* (of *Washington Association of Prosecuting Attorneys*), for respondent.

*Raegen N. Rasnic* on behalf of American Civil Liberties Union, amicus curiae.

*Anna M. Laurie* on behalf of Bremerton Housing Authority, amicus curiae.

*Marya A. Gingrey* on behalf of Seattle Housing Authority, amicus curiae.

*Michael J. Mirra* and *Eleanor Hamburger* on behalf of Westpark/Tara Heights Resident Council and Hillside Terrace Resident Council, amici curiae.

MADSEN, J. — Karl Widell and Larry Blunt were each convicted in separate jury trials in Bremerton Municipal Court of multiple counts of second degree criminal trespass. The convictions were based on violations of the Bremerton Housing Authority's (BHA) antitrespassing policy, in place at BHA's Westpark facility. *See* Bremerton Municipal Code (BMC) 9A.36.150; RCW 9A.52.080. The cases were consolidated for appeal, culminating in affirmance by the Kitsap County Superior Court. We accepted direct review and affirm four of the convictions and reverse four.

## FACTS

The BHA was established to provide affordable, sanitary, and safe housing to low-income individuals. *See* RCW 35-.82.010, .020(9). Over 60 years ago, the Washington State Legislature declared the dire need for subsidized housing programs.

> It is hereby declared: (1) That there exist in the state insanitary or unsafe dwelling accommodations and that persons of low income are forced to reside in such insanitary or unsafe accommodations; that within the state there is a shortage of safe or sanitary dwelling accommodations available at rents which persons of low income can afford and that such persons are forced to occupy overcrowded and congested dwelling accommodations; that the aforesaid conditions cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the residents of the state and impair economic values; that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities; (2) that these areas in the state cannot be cleared, nor can the shortage of safe and sanitary dwellings for persons of low income be relieved, through the operation of private enterprise, and that the construction of housing projects for persons of low income (as herein defined) would therefore not be competitive with private enterprise; (3) that the clearance, replanning and reconstruction of the areas in which insanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes for which public money may be spent and private property acquired and are governmental functions of state concern . . . .

RCW 35.82.010 (originally enacted as LAWS OF 1939, ch. 23, § 2); *see also In re Hous. Auth. of Seattle*, 62 Wn.2d 492, 383 P.2d 295 (1963).

Westpark, a 74-acre, 582 unit development of single family homes, duplexes, and fourplexes, was established to further this mandate and mission. In 1996, in response to

criminal activity in Westpark, BHA established an antitrespassing policy. This policy allows the revocation of a nonresident's license to be on the common areas of the premises if the nonresident is found engaging in specified criminal and offensive conduct, including, among other things, the making of "unreasonable noise" and "fighting." Clerk's Papers (CP) at 211.[1]

Pursuant to the BHA policy, a person is issued a "trespass warning" when observed engaging in specified conduct. This warning informs the recipient that they "are prohibited from entering or remaining on the common areas of [Westpark] for any reason whatsoever" and that "enter[ing] or remain[ing] on [Westpark] property may result in your arrest for Criminal Trespass." CP at 759. The warning

---

[1] Bremerton Housing Authority's (BHA) exclusion policy states in full:

Any non-resident will be directed to leave and will be barred from returning to any Housing Authority of the City of Bremerton (BHA) development within which that person:

1. Makes unreasonable noise;

2. Engages in fighting or in violent or threatening behavior;

3. Substantially interferes with any right, comfort or convenience of any BHA Resident or employee;

4. Engages in any activity which constitutes a criminal offense;

5. Engages in any activity involving firearms, illegal drugs or violence;

6. Damages, defaces or destroys any property belonging to BHA, or and [sic] BHA Resident or employee;

7. Litters on any BHA property;

8. Drives in a careless or reckless manner;

9. Consumes or possesses an open container of any alcoholic beverage on the common areas without being accompanied (meaning actual physical presence) by an adult (meaning 21 year or older) Resident (meaning listed on page 1 of the lease) of that development;

10. Engages in gang activity, including, but not limited to:

   a.: Grouping to show gang affiliation or to intimidate rival gangs, residents or employees, or

   b.: Using hand signals or gestures for the purpose of intimidation, or for the purpose of provoking a violent response; or

11. Violates any applicable city or county curfew ordinance.

Any person who fails to leave the property after being directed to do so, or who returns to the property after being given such direction, will be subject to arrest and prosecution for Criminal Trespass under BMC 9A.36.150 & RCW 9A.52.080.

Clerk's Papers (CP) at 211.

further provides notice of a right to appeal the exclusion, as well as a method for obtaining a temporary waiver. The BHA has contracted with the Bremerton Police Department to enforce this policy.

In July 1996, police issued a trespass warning to Petitioner Blunt for an incident involving assault and lewd conduct. Blunt's fiancée, Emily Malhi, lived in Westpark at all times relevant to this appeal. Between February 1997 and August 1997, Blunt was charged with six counts of criminal trespass in the second degree. On at least three of the occasions giving rise to the charges, Blunt was seen walking through the common areas of Westpark. On a fourth occasion, Blunt was exiting a taxi in front of his fiancée's home with his fiancée when he was spotted by police. On the fifth, Blunt was seen traveling in a vehicle on a public street in Westpark. Finally, on the sixth occasion, Blunt was at his fiancée's home and then fled police on the path along the public street.

Petitioner Widell received a trespass warning in August 1996, based on disorderly conduct and assault. Like Blunt, Widell's fiancée Patti Michelson, lived in Westpark at all times relevant to this appeal. Widell was charged with two counts of criminal trespass for two occasions on which police saw him on the premises of Westpark. On February 10, 1997, Widell was seen on the outer perimeter of the housing complex, several blocks from his fiancée's home. On July 7, 1997, Widell was seen at an intersection in Westpark with his fiancée.

Widell and Blunt were convicted on all counts in separate jury trials in Bremerton Municipal Court. Their cases were consolidated and appealed, and the Kitsap County Superior Court affirmed.

## ANALYSIS

The BMC provisions identifying the crime of trespass in the second degree, and all applicable defenses, incorporate

by reference the state statutory provisions on the same matter. *See* BMC 9A.36.150, .170. RCW 9A.52.080 states:

> (1) A person is guilty of criminal trespass in the second degree if he knowingly enters or remains unlawfully in or upon premises of another under circumstances not constituting criminal trespass in the first degree.
>
> (2) Criminal trespass in the second degree is a misdemeanor.

RCW 9A.52.090 provides several defenses to the above crime:

> In any prosecution under RCW 9A.52.070 and 9A.52.080, it is a defense that:
>
> (1) A building involved in an offense under RCW 9A.52.070 was abandoned; or
>
> (2) The premises were at the time open to members of the public and the actor complied with all lawful conditions imposed on access to or remaining in the premises; or
>
> (3) *The actor reasonably believed that the owner of the premises, or other person empowered to license access thereto, would have licensed him to enter or remain*; or
>
> (4) The actor was attempting to serve legal process . . . .

(Emphasis added.) Petitioners raise several challenges to their convictions. First, both Petitioners assert that they were invited by their fiancées to be on Westpark property, and that these invitations prevail over the right of BHA to exclude them from Westpark. Second, each contends that exclusion from Westpark unduly burdened his right of "intimate association" by denying the right to visit his fiancée. And, finally, they both argue that BHA's antitrespassing policy is unconstitutionally overbroad and void for vagueness.

I

As an initial matter, the City argues that the validity of BHA's antitrespassing policy, as well as the validity of the orders excluding Petitioners from Westpark, cannot be raised in a criminal proceeding. Specifically, the City argues

that Petitioners should be collaterally barred from questioning their initial exclusion from Westpark, which constitutes the underlying basis for their criminal charges. *See State v. Coe*, 101 Wn.2d 364, 679 P.2d 353 (1984). We reject this contention.

■ The City attempts to analogize this case to criminal contempt decisions, in which it is generally held that a court order "cannot be collaterally attacked in contempt proceedings arising from its violation, since a contempt judgment will normally stand even if the order violated was erroneous or was later ruled invalid." *Id.* at 370. This is true, unless the court issuing the underlying order lacked jurisdiction to issue the order. *Id.* The policy underlying the collateral bar rule is respect for independent judicial decision making. We see no reason to extend this deference to housing authority policies or exclusion orders issued by individual police officers.

The City further relies on *City of Bremerton v. Spears*, 134 Wn.2d 141, 164, 949 P.2d 347 (1998), in support of its argument that Petitioners should not be allowed to challenge the validity of BHA's antitrespassing policy. The defendant in *Spears* was charged with violation of a state statute requiring motorcycle riders to wear helmets approved by the state patrol. The defendant argued that the patrol violated the Administrative Procedure Act (chapter 34.05 RCW) requirements in promulgating the regulation defining approved helmets. This Court declined to consider that challenge, however, because the defendant had failed to make the patrol a party to the action. *Id.* at 164. Nevertheless, the defendant was permitted to challenge the state patrol's regulations as unconstitutionally vague. *Id.* at 161-64.

Unlike the argument disallowed in *Spears*, Petitioners' challenge here does not involve the procedures followed by BHA in promulgating the antitrespass policy nor BHA's authority to do so. Instead, Petitioners' arguments are more similar to the constitutional challenges which were permitted in *Spears*. Whether the antitrespass policy may serve to

exclude the Petitioners is far from a collateral matter or procedural complaint. *See State v. Howe*, 116 Wn.2d 466, 805 P.2d 806 (1991) (in burglary prosecution of parent's home, defendant raised invalid exclusion to establish that entry was lawful).

## II

■■ It is a statutory defense to the crime of criminal trespass that "[t]he actor reasonably believed that the owner of the premises, or other person empowered to license access thereto, would have licensed him to enter or remain." RCW 9A.52.090(3). Statutory defenses to criminal trespass negate the unlawful presence element of criminal trespass and are therefore not affirmative defenses. *State v. R.H.*, 86 Wn. App. 807, 812, 939 P.2d 217 (1997). Further, the burden is on the State to prove the absence of the defense when a defendant asserts his or her entry was permissible under RCW 9A.52.090(2) because that defense "negates the requirement for criminal trespass that the entry be unlawful." *State v. Finley*, 97 Wn. App. 129, 138, 982 P.2d 681 (1999). Thus, once a defendant has offered some evidence that his or her entry was permissible under RCW 9A.52.090, the State bears the burden to prove beyond a reasonable doubt that the defendant lacked license to enter. *See, e.g., State v. McCullum*, 98 Wn.2d 484, 490, 656 P.2d 1064 (1983) (self-defense is a statutory defense and, as such, once properly raised, the absence of self-defense becomes another element of the offense which the State must prove beyond a reasonable doubt).

Petitioners contend that a tenant's invitation to a guest will overcome an objection by a public or private landlord that the same guest is prohibited from entering the common areas of the leased premises. In essence, Petitioners argue that a tenant is an "other person empowered to license access thereto" for purposes of the defense found in RCW 9A.52.090(3).

Petitioners' position is supported by authority from other jurisdictions. As one court recently noted:

The common law is clear that the landlord may not prevent invitees or licensees of the tenant from entering the tenant's premises by passing through the common area. Moreover, the law is clear that an invitee or licensee who does so, even after a specific prohibition by the landlord, is not a trespasser and does not violate a criminal trespass statute.

*State v. Dixon*, 169 Vt. 15, 725 A.2d 920, 922 (1999) (citations omitted); *see State v. Schaffel*, 4 Conn. Cir. Ct. 234, 229 A.2d 552, 562 (1966); *Arbee v. Collins*, 219 Ga. App. 63, 463 S.E.2d 922, 925 (1995).

While this court has not addressed the question directly, our case law has not altered the common law rule. In *City of Seattle v. McCready*, 124 Wn.2d 300, 877 P.2d 686 (1994), we recognized that landlords and tenants possess joint control over the common areas of a multiunit dwelling. Accordingly, we held that city building inspectors have the authority to inspect the common areas of an apartment at the invitation of a tenant. In *State v. Fox*, 82 Wn.2d 289, 510 P.2d 230 (1973), we overturned the trespass convictions of a legal services attorney and union organizer who, at a migrant farm-worker's invitation, entered the boarding area of an asparagus farm over the farm-owner's objection.

While we recognize the common law rule upon which Petitioners rely, we also note this rule has coexisted with another common law rule of long standing, i.e., that the landlord had no obligation to protect his tenants. The second of these rules has been eroded in the modern era. In 1970, for the first time, a court held that landlords owe their tenants a duty of protection. *Kline v. 1500 Mass. Ave. Apartment Corp.*, 439 F.2d 477 (D.C. Cir. 1970). As *Prosser and Keeton* acknowledges, since 1970 courts have recognized the landlord's duty of care may include measures to protect others from criminal attacks, provided the attacks are reasonably foreseeable and preventable. W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 63, at 442-43 (W. Page Keeton ed., 5th ed. 1984) (citing *Kline* (owner of urban multiple-unit apartment dwelling had duty of reasonable care to protect tenants from foreseeable

criminal assaults)); *see generally*, *e.g.*, *Tenney v. Atl. Assocs.*, 594 N.W.2d 11 (Iowa 1999); *see also* Tracey A. Bateman & Susan Thomas, Annotation, *Landlord's Liability for Failure to Protect Tenant from Criminal Acts of Third Person*, 43 A.L.R.5th 207, § 4[a]-[c] (1996) (addressing cases where courts have held that a landlord has a duty to protect tenants against reasonably foreseeable criminal acts of third parties).

This court has acknowledged the principle that a landlord may have such a duty, *Hutchins v. 1001 Fourth Avenue Associates*, 116 Wn.2d 217, 224, 802 P.2d 1360 (1991), but we have never squarely addressed the issue. *See Griffin v. W. RS, Inc.*, 143 Wn.2d 81, 83, 18 P.3d 558 (2001) ("The principal question is whether, or to what extent, a residential landlord is legally obliged to protect its tenants from the foreseeable criminal acts of third persons. But this question we need not answer . . . ."). Should a landlord be held civilly liable for the foreseeable criminal acts of third parties causing injury to the landlord's tenant? It would seem only reasonable that the landlord should at the same time enjoy the right to exclude persons who may foreseeably cause such injury.[2]

---

[2] Recognizing the legitimate landlord concerns, courts have noted that tenants of public housing, like all tenants living in communal environments, may have their right to invite guests restricted by the terms of their lease. *See* RESTATEMENT (SECOND) OF TORTS § 189 cmt. c (1965). The Illinois Supreme Court has spoken directly on this issue.

As a condition to moving into the apartment complex, tenants agreed to abide by the terms set forth in their lease as well as the rules and regulations promulgated by the management. One of the terms to which tenants agreed was that [the apartment complex], as lessor, reserved the right to bar persons from its property. Any tenant's attempt to invite an individual onto the property who had already been barred by management would result in breach of the lease. . . . As a result, any attempt by tenants to invite [persons] onto the premises would be invalid.

*Williams v. Nagel*, 162 Ill. 2d 542, 643 N.E.2d 816, 822, 205 Ill. Dec. 525 (1994). Additionally, while not controlling in this case, we note the recent decision in *Department of Housing & Urban Development v. Rucker*, 535 U.S. 125, 122 S. Ct. 1230, 152 L. Ed. 2d 258 (2002). There, the Supreme Court held that tenants of public housing may be evicted under 42 U.S.C. § 11901(3) (1994), the Anti-Drug Abuse Act of 1988, for criminal conduct engaged in by a household member or guest. The act requires that public housing agencies "'utilize leases which . . . provide that any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or off such premises, engaged in by a public housing tenant,

We need not resolve a landlord's dilemma in this case, however, because even under the common law rule a nonresident must be licensed and the incursion must fall within the scope of that license. An invited visitor may proceed only through those common areas necessary for ingress and egress from the tenant's unit. In essence, "[a] tenant's guest may not proceed at will to a part of the premises wholly disconnected to the purpose of the invitation and use the invitation as a defense to a charge of criminal trespass." *Arbee v. Collins*, 219 Ga. App. 63, 463 S.E.2d 922, 925-26 (1995). *Cf. Konick v. Champneys*, 108 Wash. 35, 41, 183 P. 75 (1919) (owner of apartment house may reasonably limit access of tenants' guests in common areas).

The City bears the burden here of showing either that Petitioners were not invited onto the premises of Westpark on the dates for which they received criminal trespass citations or that they exceeded the scope of their invitation. In reviewing the sufficiency of the evidence, the test is whether, "viewing the evidence most favorable to the State, a rational trier of fact could find the essential elements of the charged crime have been proven beyond a reasonable doubt." *State v. Espinoza*, 112 Wn.2d 819, 827, 774 P.2d 1177 (1989). In such circumstances the court will "admit[] the truth of the State's evidence and all inferences that can be reasonably drawn therefrom." *State v. Theroff*, 25 Wn. App. 590, 593, 608 P.2d 1254 (1980). The City offered evidence that both Widell and Blunt had received warnings from police officers, acting on behalf of the BHA not to enter the premises of Westpark. The Petitioners then each offered evidence that they had open invitations from their respective fiancées to come to their apartments on Westpark premises. The City did not overcome the evidence that

any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy.' " *Rucker*, 535 U.S. at 127 (quoting 42 U.S.C. § 1437d(*l*)(6) (1994 & Supp. V 1999). Neither of the leases for Widell or Blunt's fiancées were introduced at trial and are not part of the record before us. *Rucker* is noteworthy however because it shows that another option may have been available to the BHA for maintaining a safe environment at Westpark.

Petitioners had standing invitations to enter the apartments and a rational juror could have concluded that Petitioners each had license to be at the apartments because of the invitations. Thus, Petitioners' convictions can stand only if a rational juror could have found beyond a reasonable doubt that Widell or Blunt exceeded the scope of the invitation to visit their fiancées' apartment units on any of the occasions for which they are charged with trespassing.

### BLUNT

Officers testified that on at least three of the six occasions that Blunt was cited for trespassing in 1997, he was seen walking alone through the common areas of Westpark. On June 5, 1997, Blunt was seen walking between the houses in Westpark and then fled on foot. CP at 624. On June 29, 1997, and July 1, 1997, Blunt was seen walking in the common areas of Westpark and again fled on foot. CP at 240, 625-26. Blunt was not traveling on the street or sidewalk to his fiancée's door but was seen instead several blocks from her unit at Westpark, in the common areas between houses, by himself. The City offered evidence that Blunt was exceeding the scope of any invitation he might have had, and a rational juror could conclude that the City met its burden in establishing this beyond a reasonable doubt.

In contrast, on February 3, 1997, Blunt was seen exiting a taxi with his fiancée in front of her apartment; on June 12, 1997, Blunt was in a vehicle traveling on a public street in Westpark; and finally, on August 3, 1997, Blunt was at his fiancée's home and then on a pathway along a public street in Westpark. In these instances, Blunt was either with his fiancée at her home or was on a pathway along the public street on which his fiancée lived. We hold that a rational juror could have concluded that the City failed to meet its burden to show that Blunt was exceeding the scope of his invitation on these counts because on each occasion Blunt was either on public thoroughfares enroute to his fiancée's home or with his fiancée.

WIDELL

Officers testified that on February 10, 1997, Widell was seen on Westpark property several blocks from his fiancée's home. He was not with his fiancée on this occasion. On July 7, 1997, Widell was spotted by police officers at an intersection of two public streets within Westpark with his fiancée, near her apartment unit. Officers issued criminal trespass citations for both occasions. Based on the evidence presented, we hold that a rational juror could have concluded that the City failed to show beyond a reasonable doubt that Widell exceeded the scope of any invitation on July 7, 1997, because he was accompanied by a resident of Westpark when he was seen by police and was near her unit. We hold that a rational juror could have concluded however, based on the evidence presented, that on February 10, 1997, Widell exceeded the scope of any invitation he may have had because he was seen alone, several blocks from his fiancée's apartment.[3]

### III

■ Alternatively, Widell and Blunt argue that BHA's antitrespassing policy unconstitutionally infringes upon their rights of "intimate association." In *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984), the Supreme Court identified two types of associational rights protected by the Constitution: the freedom of "expressive association" and freedom of "intimate association." The right of expressive association stems from the First Amendment, guarding those activities protected by that amendment: speech, assembly, petition for the redress of grievances, and the exercise of religion. *Id.* at 618. The right of "intimate association" is derived from the due process concepts of the Fourteenth Amendment and the principles of liberty and privacy found in the Bill of Rights. *Id.* It is the latter associational right which is at issue in this case.

---

[3] There was testimony at trial that Widell had another friend within Westpark who may have extended an invitation to him but, even if that is true, Widell was nowhere near this individual's unit on February 10, 1997.

The Supreme Court has defined the right of intimate association as one protecting the

> choices to enter into and maintain certain intimate human relationships [that] must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme.

*Id.* at 617-18. These certain "intimate human relationships" are those "that attend the creation and sustenance of a family." *Id.* at 619. They include: marriage, *Zablocki v. Redhail*, 434 U.S. 374, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978); childbirth, *Carey v. Population Services International*, 431 U.S. 678, 97 S. Ct. 2010, 52 L. Ed. 2d 675 (1977); the raising and educating of one's children, *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); and cohabitation with one's relatives, *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977). These are the types of "personal bonds [that] have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; [thereby] foster[ing] diversity and act[ing] as critical buffers between the individual and the State." *Roberts*, 468 U.S. at 618-19.

Whether the right of intimate association applies to nonfamilial relationships, like those between Widell and Blunt and their fiancées, remains an open question.[4] In *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 545, 107 S. Ct. 1940, 95 L. Ed. 2d 474 (1987), the Supreme Court specifically noted that it had "not held that constitutional protection is restricted to relationships among family members." Instead the Court has endorsed a continuum approach, delineating where the "objective characteristics locate [the relationship] on a

---

[4] Blunt also has children who reside in Westpark. CP at 297. However, the record is silent as to whether those children are adults, whether Blunt is legally entitled to visit with them, whether the children wish to see Blunt, or whether the children's mother would be willing to allow Blunt to visit. Furthermore, there is no evidence Blunt was visiting his children on any of the six occasions in which he was cited for criminal trespass.

spectrum from the most intimate to the most attenuated of personal attachments." *Roberts*, 468 U.S. at 620. Among the relevant characteristics distinguishing a protected relationship are "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.*

Nevertheless, the Supreme Court has never extended constitutional protection to nonfamilial relationships. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990) (patrons of motel, which limited rental of rooms to 10 hours, did not have the type of intimate relationship protected by the constitution); *Bowers v. Hardwick*, 478 U.S. 186, 191, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986) (holding that "[n]o connection between family, marriage, or procreation on the one hand and homosexual activity on the other has been demonstrated"); *Rotary Int'l*, 481 U.S. 537 (relationship among Rotary Club members is not the type of intimate relationship that is constitutionally protected). Indeed, in at least one circuit, it has been held that a nonblood familial relationship, short of marriage, is not constitutionally protected. *See Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir. 1988) (brother-in-law relationship not protected); *but see Wilson v. Taylor*, 733 F.2d 1539, 1542-44 (11th Cir. 1984) (pre-*Roberts* decision holding dating relationship protected under right of intimate association), *overruling recognized by Swank v. Smart*, 898 F.2d 1247, 1252 (7th Cir. 1990) (Posner, J.) (stating that "*Wilson* was decided three weeks before *Roberts*, and did not survive it"). We are also mindful that our own cases have held that the right of intimate association stems from the right of privacy, which normally applies only to familial relationships, and "extend[s] only so far as the principles of substantive due process permit." *Bedford v. Sugarman*, 112 Wn.2d 500, 517, 772 P.2d 486 (1989).

While we decline to hold that the right of intimate association is limited solely to familial relationships, we do believe that an engaged couple who is not cohabitating is not entitled to constitutional protection. We recognize that

an engaged couple may share many of the characteristics cited in *Roberts*, but we are equally cognizant that an engagement is not the type of relationship that has "played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; [thereby] foster[ing] diversity and act[ing] as critical buffers between the individual and the power of State." *Roberts*, 468 U.S. at 618-19.[5]

Since Widell and Blunt have failed to establish a constitutionally protected right to enter Westpark, "we need not decide whether the procedures employed in this case were adequate to afford the due process protection required before one can be deprived of a constitutionally-protected interest." *Souders v. Lucero*, 196 F.3d 1040, 1046 (9th Cir. 1999).

## IV

▇ Petitioners' final argument is that BHA's antitrespassing policy is constitutionally infirm on the grounds that it is overbroad and void for vagueness.[6] We reject Petitioners' overbreadth argument on its face. We have "generally confined the overbreadth argument to statutes or ordinances impinging on First Amendment activities." *City of Seattle v. Montana*, 129 Wn.2d 583, 598 n.7, 919 P.2d 1218 (1996) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S. Ct. 2908, 2914-15, 37 L. Ed. 2d 830 (1973)). No First Amendment considerations exist under the facts of this case.

---

[5] It is also significant that more severe impediments to the right of intimate association have been upheld by the United States Supreme Court. In *Rucker*, the Supreme Court held that the eviction of public housing tenants due to the actions of their guests or family members did not violate tenants' right to freedom of intimate association. *Rucker*, 535 U.S. Ct. at 136 n.6 (respondent's claim, that the eviction of tenants who did not know about the illegal activities of their guests violates the First Amendment guaranty of freedom of association, was foreclosed) (citing *Lyng v. Int'l Union, United Auto.*, 485 U.S. 360, 108 S. Ct. 1184, 99 L. Ed. 2d 380 (1988)).

[6] Petitioners, in their briefing, refer only to "the Criminal Trespass Ordinance"; however, it appears that it is BHA's antitrespassing policy to which they are referring.

Petitioners also argue that Washington Constitution article I, section 3 (Washington's due process clause) provides an independent state law basis for extending the overbreadth doctrine to personal rights. While we note that Petitioners have at least superficially briefed the *Gunwall* factors, they have not presented any persuasive basis upon which we might extend the overbreadth doctrine to a claim of right not arising under the First Amendment. *See State v. Gunwall*, 106 Wn.2d 54, 61-62, 720 P.2d 808 (1986). As we have previously noted, "[t]his court traditionally has practiced great restraint in expanding state due process beyond federal perimeters . . . due to the similarity of the language [between the state and federal provisions]." *Rozner v. City of Bellevue*, 116 Wn.2d 342, 351, 804 P.2d 24 (1991).

■ Even if we were to extend the overbreadth doctrine to permit a challenge based on the right of intimate association, we would not find a constitutional violation on these facts. The right of intimate association is not absolute. In the area of marriage, which is perhaps the most protected of intimate relationships, a two-part test is applied to assess the constitutionality of a state action:

> [D]etermining the appropriate level of scrutiny to apply to governmental action alleged to infringe the right of marriage requires a two-step analysis: first, a court must ask whether the policy or action is a direct or substantial interference with the right of marriage; second, if the policy or action is a direct and substantial interference with the right of marriage, apply strict scrutiny, otherwise apply rational basis scrutiny. In this context, strict scrutiny means that the state action burdening marriage cannot be upheld "unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests."

*Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996) (quoting *Zablocki*, 434 U.S. at 388); *see also Lyng v. Castillo*, 477 U.S. 635, 106 S. Ct. 2727, 91 L. Ed. 2d 527 (1986). Examples of "direct and substantial" burdens on the right of marriage include antimiscegenation statutes, *Loving v. Virginia*, 388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. 2d 1010

(1967), and laws requiring noncustodial parents who were obligated to support their children to obtain court permission before marrying. *Zablocki*, 434 U.S. 374. Those regulations and actions that have been held to not pose a "direct and substantial" burden include the Internal Revenue Service marriage penalty, *Druker v. Commissioner of Internal Revenue*, 697 F.2d 46, 50 (2d Cir. 1982); loss or reduction of governmental benefits, *Califano v. Jobst*, 434 U.S. 47, 98 S. Ct. 95, 54 L. Ed. 2d 228 (1977); eviction of public housing tenants for the illegal acts of their related guests, *Chavez v. Housing Authority of El Paso*, 973 F.2d 1245, 1248 (5th Cir. 1992); and transferring of employees under an antinepotism policy, *Montgomery*, 101 F.3d 1117.

BHA's facially neutral exclusion policy does not place a "direct and substantial" burden on intimate association rights. Unlike the antimiscegenation laws at issue in *Loving*, by excluding nonresidents from Westpark the State has not hindered their ability to marry the person of their choosing. Nor has the State intruded upon the nonresident's ability to intimately associate in an alternative locale. By its terms, BHA's antitrespassing policy applies only to nonresidents, so it is also true that no person would be banished from the family home.

It is equally clear that BHA's exclusion policy is "rationally related to a legitimate government interest." *Parks v. City of Warner Robins*, 43 F.3d 609, 615 (11th Cir. 1995). BHA is legislatively mandated to provide affordable, sanitary, and safe housing to low-income individuals. RCW 35.82.010, .020(9). The State, no less than a private property owner, "may control the use of its property so long as the restriction is for a lawful, nondiscriminatory purpose." *State v. Blair*, 65 Wn. App. 64, 67, 827 P.2d 356 (1992) (citing *Adderley v. Florida*, 385 U.S. 39, 47, 87 S. Ct. 242, 247, 17 L. Ed. 2d 149 (1966)). By excluding nonresidents who engage in illegal or offensive conduct, BHA is merely furthering its legislative mandate by protecting the safety and well-being of Westpark's residents, which is unquestionably a legitimate government purpose. *See Daniel v.*

*City of Tampa*, 38 F.3d 546 (11th Cir. 1994) (upholding Florida criminal trespass statute, applicable to public housing, as a reasonable means of combating rampant drug and crime problems on housing authority property).

We also reject Petitioners' void for vagueness argument. A statute is void for vagueness under the Fourteenth Amendment to the United States Constitution if it does not define the criminal offense with sufficient definiteness so that ordinary people can understand what conduct is prohibited, or if it fails to " 'provide ascertainable standards of guilt to protect against arbitrary enforcement.' " *State v. Thorne*, 129 Wn.2d 736, 770, 921 P.2d 514 (1996) (quoting *State v. Myles*, 127 Wn.2d 807, 812, 903 P.2d 979 (1995)); *see also State v. Lee*, 135 Wn.2d 369, 957 P.2d 741 (1998).

■ BHA's exclusion criteria contained in Westpark's antitrespassing policy do not define a criminal offense, but rather identify the bases upon which an individual may be denied future entry onto Westpark property. BHA's policy is not a part of BMC 9A.36.150 under which Petitioners were charged.

## CONCLUSION

We hold that the State bears the burden on proving the absence of a statutory defense to criminal trespass. We hold that Petitioners may assert their fiancées' invitations as a defense to a charge of criminal trespass. We further hold that here, Petitioners exceeded the scope of the invitation on the four occasions they were alone on the common areas of Westpark, in areas distant from their fiancées' apartments, and affirm those convictions. We reverse the other four convictions because Petitioners were within the scope of the invitation onto Westpark premises. In addition, we hold that Petitioners' rights of intimate association were not unconstitutionally impinged by their exclusion from

Westpark. We also reject Petitioners' arguments regarding overbreadth and vagueness.

ALEXANDER, C.J., and SMITH, JOHNSON, SANDERS, IRELAND, BRIDGE, CHAMBERS, and OWENS, JJ., concur.